In re ELGOT et al.

(District Court, S. D. New York. June 30, 1924.)

1. Bankruptcy ⚖⇒477—Evidence held insufficient to show that profitable business was conducted by alleged bankrupts, so as to entitle them to damages to good will and for loss of prospective profits.

Evidence *held* insufficient to show that profitable business was conducted by alleged bankrupts, so as to entitle them to damages to good will and for loss of prospective profits, under Bankruptcy Act, § 3a (Comp. St. § 9587), on dismissal of petition.

2. Bankruptcy ⚖⇒477—Claims held prima facie items of damages to alleged bankrupts on dismissal of petition.

Items representing alleged bankrupts' equities in machinery and trucks, cost of hauling, freight and installation in plant, security deposited under lease, and moneys in bank, *held* prima facie items of damage to bankrupts' corporate property, under Bankruptcy Act, §

3a (Comp. St. § 9587), on dismissal of petition.

3. Bankruptcy ⚖⇒474—Liability for damages to alleged bankrupts on dismissal of petition held enforceable only against creditor securing appointment of receiver.

Under Bankruptcy Act, § 3d (Comp. St. § 9587), liability for costs, expenses, and damages to alleged bankrupts from seizure, taking, or detention of property, on dismissal of petition, is enforceable only against creditor who secured appointment of receiver.

Affirmed in 10 F.(2d) 399.

J. G. M. Browne, of New York City, for alleged bankrupts.

William Hauser, of Newark, N. J., for National Box & Lumber Co.

Paul Englander, of New York City, pro se and for Sheffield Glass Bottle Co.

AUGUSTUS N. HAND, District Judge. This matter comes up on exceptions to the report of John J. Townsend, special master under an order of reference "to take proof and fix * * * the costs and expenses and damages of the alleged bankrupts."

The petition in bankruptcy was filed against the alleged bankrupts by the Whistle Bottling Company, Inc., National Box & Lumber Company, and Sheffield Glass Bottle Company, and the creditors, Standard Porcelain Enameling Company, George Schmidt, and Paul Englander, intervening. On July 29, upon the application of one of the petitioning creditors only, viz. Whistle Bottling Company, Inc., a receiver was appointed. The issues were tried by Referee Townsend, and upon his report the petition in bankruptcy was dismissed on October 17, 1921, and the foregoing order of reference under section 3a of the Bankruptcy Act (Comp. St. § 9588) was made. The dismissal of the bankruptcy proceeding was not based upon the insolvency of the alleged bankrupts, and no finding in respect to that matter has been made.

"Whistle" is a syrup manufactured by the Whistle Company of Pennsylvania, Inc., and the product of this company was handled by licensees. The alleged bankrupts ob-

tained a sublicense, and on or about May 14, 1921, began the distribution of "Whistle," which it continued to distribute until June 15, 1921. Thereafter it ceased to distribute "Whistle," and used its plant and machinery at No. 1360 Lafayette avenue, in the Bronx, for the bottling and distribution of other kinds of syrup.

[1] The damages which the alleged bankrupts attempted to prove were as to (a) cash investments, aggregating $13,614.84; (b) value of good will $24,207.12; (c) loss of profits, $9,463.99. It is to be noted that the alleged bankrupts were only doing any business which they claimed to have been profitable for about two months. Under these circumstances, and after a careful opinion, the master held that there was no basis established for valuing the good will, and he likewise held that there was insufficient proof that there would have been any profits in the enterprise during the period between the filing of the petition and the dismissal of the bankruptcy proceeding. The machinery and trucks furnished for the enterprise were only partly paid for, and were purchased upon conditional sale. The alleged bankrupts, after distributing "Whistle" for only one month, voluntarily gave it up, because the sale of it was not profitable, unless accompanied by the distribution of other syrups, and the licensor would not accede to a license, if other syrups were to be handled by the licensee.

When Elgot, one of the alleged bankrupts, was under examination before the master, he was confronted with his former testimony, and the following appears from the minutes:

"Cross-examination by Mr. Hauser:

"Q. Mr. Elgot, do you remember your testimony on the main case, when it was here before the referee, before to-day? A. I have some idea of it.

"Q. I read you from page 68 of your testimony: 'Q. What was your income per month you received from this business? A. About $3,000 or $4,000 per month.' Do you remember that? A. Well, that was—

"Q. Do you remember that question and answer? A. I have some idea of that answer.

"Q. You recognize, of course, these are the official minutes? A. I don't doubt you are reading correctly from the paper before you.

"Q. If you so testified at that time, it was true, wasn't it? A. No, sir; it was just simply an offhand guess of what I was doing at that time, without looking at the books.

"Q. Let me ask you this: 'Q. (by the referee). Up to what time did you receive that per month? A. Up to the time we stopped buying Whistle. Q. When you were handling Whistle, you received $3,000 or $4,000 per month? A. Yes. Q. Why did you stop? A. We were not making any money.' Do you remember those questions and answers on pages 68 and 69; they were true when they were made? A. Yes, sir; we did not make enough money—

"Q. I didn't ask you that; I have read your testimony. Let me read your further: 'Q. (by the referee). Your $3,000 or $4,000 a month was eaten up with overhead expenses? A. Yes; our money was spent for salesmen, doing missionary work, among retailers, painting signs, wall boards, and so forth. Q. You were not receiving $3,000 or $4,000 per month profit? A. No, sir; that is what we took in each month.' A. That was the figure I gave and remembered at that time; but to-day these are the figures which were taken from the books, and are correct, absolutely. At that time I did not look at any books, and did not refer to them, and did not even have a correct idea of what we had."

Elgot maintained that there was a net profit of 30 cents per case after taking practically everything into account upon sales of "Whistle" between May 14 and June 15. He kept no ledger or cash book (see testimony of Yardley, minutes, p. 50), and the only books offered tending to show sales of syrups and payments for wages and salaries were memorandum books, Exhibits 21 and 27. The amount received for the syrup is based upon the testimony of Elgot and his bookkeeper, Yardley, from memory, and the outgo for wages and salaries was attempted to be proved by the memorandum book, Exhibit 21. The cost of purchasing, bottling, and delivering "Whistle" is avowedly an estimate of Elgot, to some extent fortified by Exhibits 21 and 27. These exhibits the master did not regard as books of original entry; but, whether or not that be the case, there is no sufficient evidence of the outgo of the business, no check or cash book was produced, showing what was done with the moneys received for the alleged sales of syrup, and the testimony as it stands is based upon the memory of two witnesses, supported as to certain details by Exhibits 21 and 27.

It is, moreover, to be noted that the payments for salesmen's salaries to advertise and push the sales, which are really carried in the capital account, were some of them made to men who were evidently also drivers,

who made the deliveries, and it is very questionable whether payments to so-called salesmen were not, most of them, for current expenses necessary to keep the business going, and not properly chargeable to a capital account. The only books put in evidence were for payments on account of machinery and bottles, with the exception of 16 checks, aggregating $417.49, alleged to have been payments of salaries to so-called salesmen. It seems quite unlikely that a profitable business, which, as the alleged bankrupts claim, was making net earnings at the rate of about $54,000 a year, should have been conducted with so little method, and it seems quite impossible to justify charging large amounts of damages upon third parties with such a slender foundation.

After the alleged bankrupts ceased to sell "Whistle," and went into the business of selling other syrups at a lower price of 80 cents per case, they contend that a still greater profit could have been made than on "Whistle," because they manufactured the syrup themselves, and it only cost them 8 cents per case for syrup, instead of 29 cents, which they had paid for "Whistle." During this latter experiment, as well as while they distributed "Whistle," no charge is made for bottles, breakage, or deposits (to secure the return of bottles made by customers), and there is the same failure to charge any of the activities of salesmen to income account, or to furnish any ledger, cash book or check book showing in the usual way the disposition of moneys received and paid out.

We have in this case a new business, which Elgot testified he had never been in before, instituted with little capital, all the machinery purchased on conditional sale, the distribution of "Whistle" abandoned after one month because it was unsatisfactory, a business in general syrups then instituted in the hope that the old customers of "Whistle" would purchase other syrups, and Elgot testifying at a former hearing that the receipts of "Whistle" were eaten up by overhead expenses and "salesmen doing missionary work, painting signs, and wall boards." I think it clear that there is no sufficient proof that a profitable business was ever conducted by the alleged bankrupts. The good will and prospective profits are therefore not items of legal damage.

I think the master was entirely justified in rejecting the item of advertising expense. It will doubtless be suggested that there must have been some good will, if the witness Kopelman offered $15,000 for the business.

He testified that the Glory Bottling Company was willing to pay $15,000, "and take over the obligations of the plant," and place the alleged bankrupts on a certain salary for a certain time. He also stated that he "examined over the plant" and "found that there was—they had very little merchandise which belonged to them." This $15,000 was to be paid, $5,000 on taking possession of the plant, and the balance bimonthly. Elgot did not accept the offer, because he was dissatisfied with the salary offered.

It is true that this offer is some evidence of value of the business as a going concern to a man already in the business. If Kopelman was a good business man, he might well get some substantial advantage out of a list of customers and an assembled plant, when added to his own business. It does not follow that the business which he bought had made, or could make, any profits under the management of the alleged bankrupts. Moreover, he proposed to pay two-thirds of the purchase money by installment and to hire the bankrupts (who had been drawing, according to their books, $75 a week) for only $40. If the story of this unaccepted offer is true, it still was an offer to pay only $5,000 down, coupled with a benefit to the purchaser of officers' salaries at about half the existing rate. I think this offer can have little bearing on the value of the property and business.

We last come to the loss caused by damage to the so-called cash investment, classified in the master's report as A, items 1, 2, 3, 4 and 5. The first item of advertising expense, the master correctly disallowed. The business, in my opinion, had no value outside of its tangible property. If loss of customers was a marketable commodity, any sum which could be obtained for it would be wholly speculative. I regard a part of this so-called advertising as nothing more than payments to truckmen who were instructed to "talk up" wares while they were on the road making deliveries. A large part of them also seem to have been, in effect, current income disbursements, and whatever legal attribute they may have had, the result seems to have been a profitless business.

[2] Items 2, 3, 4, and 5, in subdivision A, representing equities in the machinery and trucks, cost of hauling, freight and installation in the plant, security deposited under lease, and moneys in bank, aggregate $7,814.84, and are prima facie items of damage to the corporeal property of the alleged bankrupts. It is quite certain that machinery and

equipment, which has been used for a month or two, and was consequently secondhand, would not have a market value equivalent to the purchase price, plus the cost of transportation and installation. The value of such property is always a matter of estimate, whether or not the court has the aid of an expert. I think the master made a reasonable estimate when he fixed $5,000 as the amount of physical damage occasioned by the seizure. The machinery, though new, was secondhand; the business was making no money, and large payments remained to be made before title would be complete in the alleged bankrupts.

Upon the machinery itself only $5,780 had been paid. It is very doubtful to my mind whether the transportation and installation expense had added anything to its market value, and the fact that it was secondhand had almost inevitably rendered it worth considerably less than cost. If the cash items 4 and 5, which are allowed in full, be deducted from the $5,000 (the amount allowed by the master), there is a balance applicable to the equity in the machinery and trucks of $3,895. This is a little more than two-thirds of the amounts paid upon the purchase price for the machinery and trucks.

It is to be noted that the landlord applied the deposit of $750 toward his unpaid rent, the cash in bank—$355—was consumed by the expenses of the receivership, and the chattels sold on conditional sale were taken by the vendors, so that the property of the respondents was dissipated.

[3] Inasmuch as section 3e of the Bankruptcy Act only allows "costs, counsel fees, expenses and damages occasioned by such seizure, taking or detention of property," the liability can only be enforced against the Whistle Bottling Company, Inc., of New York, which alone applied for and secured the appointment of the receiver. In re Lacov, 142 F. 960, 74 C. C. A. 130; In re Aschenbach Co., 183 F. 305, 105 C. C. A. 517; In re Ward (D. C.) 203 F. at page 773; In re Independent Machine & Tool Corporation, 251 F. 484, 163 C. C. A. 478; In re Hurlburt Motors Co., Inc. (D. C.) 275 F. 62.

An order will be made overruling the exceptions and confirming the master's report and providing that the alleged bankrupts recover from the Whistle Bottling Company, Inc., of New York, damages in the amount of $5,000, counsel fees in the amount of $850, together with the costs of the proceeding, to be taxed by the clerk.